AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

APR 1 2 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

United States of America

v.

CHAN HUNG LE,

Defendant

Case No. SA 19 - 2 9 1M

## AMENDED
## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on an unknown date but prior to June 1, 2010 and continuing to the present, in the counties of Orange and Los Angeles, in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §371 | Conspiracy to Defraud the United States, to Traffic in Counterfeit Goods in violation of 18 U.S.C. § 2320, and to Import Merchandise Illegally in violation of 18 U.S.C. § 545 |
| 18 U.S.C. § 1956(h) | Money Laundering Conspiracy |
| 18 U.S.C. § 1349 | Conspiracy to Commit Mail Fraud and Wire Fraud |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/ S /

*Complainant's signature*

Brent Rogan, Special Agent

*Printed name and title*

KAREN E. SCOTT

*Judge's signature*

Sworn to before me and signed in my presence.

Date:    4/12/19

City and state:   Los Angeles, California

Hon. Karen E. Scott, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT**

I, Brent Rogan, being duly sworn, declare and state as follows:

**I.   INTRODUCTION**

1.   I am a Special Agent ("SA") of the Department of
Homeland Security, United States Immigration and Customs
Enforcement ("ICE"), Homeland Security Investigations ("HSI"),
assigned to the Office of the Assistant Special Agent in Charge,
Orange County.  I have been a Special Agent with HSI since March
2008.  As part of my duties, I investigate violations of
criminal law relating to the illegal importation of contraband,
including counterfeit goods and controlled substances,
intellectual property rights ("IPR") violations, and related
money laundering.  My duties consist of enforcing the Tariff Act
and other laws, rules, and regulations governing the import and
export of goods and merchandise and payment of duties and fees.

2.   During my career, I have conducted and participated in
numerous complex, multi-defendant investigations involving
commercial fraud, money laundering, manufacture of fraudulent
documents, trafficking of counterfeit goods, and related
financial crimes.  I have conducted and participated in
investigations that have resulted in the identification, seizure
and federal forfeiture of millions of dollars in cash and assets
and the seizure and forfeiture of millions of dollars in
counterfeit goods.  I have also been responsible for the
detection, arrest, and conviction of numerous individuals.

3.   As part of my employment, I have received training
from ICE and U.S. Customs and Border Protection ("CBP") relative

1

to investigative techniques and the conduct of fraud, IPR and financial investigations. I have a working knowledge relating to commercial fraud, including under-valuation, misclassification, and trademark/copyright violations.

## II. PURPOSE OF AFFIDAVIT

4. This affidavit is made in support of a criminal complaint against, and arrest warrant for, CHAN HUNG LE ("LE") for violations of 18 U.S.C. § 371 (Conspiracy to Defraud the United States, to Traffic in Counterfeit Goods in violation of 18 U.S.C. § 2320, and to Import Merchandise Illegally in violation of 18 U.S.C. § 545); 18 U.S.C. § 1956(h) (Money Laundering Conspiracy); 18 U.S.C. § 1349 (Conspiracy to Commit Mail Fraud and Wire Fraud); and 18 U.S.C. § 1028A (Aggravated Identity Theft) (the "Subject Offenses").

5. This affidavit is also made in support of search warrants for (1) 15041 Bake Parkway, Unit C, in Irvine, California ("PREMISES A") described in Attachment A-1, (2) 27562 Deputy Circle, Laguna Hills, California ("PREMISES B," and together with PREMISES A, the "SUBJECT PREMISES") described in Attachment A-2, and (3) the person of CHAN HUNG LE, as described in Attachment A-3, for the items to be seized described in Attachment B.

6. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there

2

is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  PREMISES AND PERSON TO BE SEARCHED

7.    The premises and person to be searched are the SUBJECT PREMISES described in Attachments A-1 and A-2, and the person of CHAN LE, as described in Attachment A-3, all of which are incorporated herein by reference.

### IV. ITEMS TO BE SEIZED

8.    The items to be seized are the evidence, fruits, and instrumentalities of violations of the Subject Offenses, as described in Attachment B, which is incorporated herein by reference.

### V.  SUMMARY OF PROBABLE CAUSE

9.    A long-term investigation by HSI and other law enforcement agencies has demonstrated that EZ Elektronix is a business in Orange County, California, that imports from China and distributes in the United States counterfeit electronics products, most commonly cellular telephones and phone parts. The company is owned by LE and his wife, T.T.  It also operates under the business names "Wholesale Gadgetfix," "Gadgetfix Corp," "Gadget Parts Direct," "US Mobile Parts," "Pac Depot," and "Fix2save Inc."  EZ Elektronix is operated by LE and T.T. along with employees J.V., M.N., and other family members and

3

employees who have helped LE smuggle counterfeit parts into the United States and evade inspection by U.S. and Hong Kong/Chinese Customs officials.  LE has used multiple business names and addresses, virtual offices, and post office boxes in at least three different U.S. states to conceal the source and destination of the smuggled counterfeit products.  Once the counterfeit parts arrive, LE and others distribute them through online stores run by LE under various names, such as eBay stores "EZ Elektronix," "usmobileparts," "gadgetfix," and "fix2save." The proceeds from the eBay sales are credited to bank accounts owned by LE via PayPal Transfers.  The proceeds of the sales are used by LE to finance the on-going scheme including by wiring funds to the Chinese counterfeit parts suppliers.

10.  Between October 2011 and February 2015, LE's businesses were the subject of one state and three federal search warrants relating to importing and trafficking in counterfeit cell phone parts and related products.  As described below, LE's conduct appears to be continuing to the present: in November 2018, HSI obtained counterfeit and misleadingly advertised merchandise from LE during an undercover purchase of cellphone parts from four of LE's eBay stores, and agents have observed activity at his warehouse and on his eBay sites consistent with his prior practices.

11.  Based on evidence obtained in connection with those actions, and other investigation set forth below, including records relating to the shipment of and payments for counterfeit

products, LE and others have been and continue to be engaged in
a conspiracy to smuggle counterfeit cell phone parts from China
for sale in the United States, have caused over $72 million to
be transferred internationally to promote the scheme, have used
wires and the mails to carry out the fraudulent scheme, and have
used the means of identification of other persons during and in
relation to these activities.  Further, as described below,
there is probable cause to believe that evidence, fruits, and
instrumentalities of LE's historical and ongoing criminal
conduct will be found at his current warehouse location, his
residence, and/or on his person.

## VI. STATEMENT OF PROBABLE CAUSE

### A.    Seizure of Counterfeit Shipments from China in 2010

12.    Based on my review of written reports, electronic
customs records databases, and conversations with other federal
law enforcement officials, I know that between June and July
2010, CBP seized three shipments of counterfeit cell phone parts
that were imported by LE from China and Hong Kong to an EZ
Elektronix business address, 14841 Moran Street in Westminster,
California (the "Moran Street Premises").  These three shipments
contained a combined total of 755 counterfeit Apple iPhone LCD
screens that were marked with trademarked "Apple" logos and
"iPhone" wordmarks.  CBP mailed a seizure notification letter to
the intended delivery address for these seizures, stating that
the shipments were being seized by CBP because the contents had

been determined to be counterfeit.  No response was received and the items have been forfeited.

**B.   Westminster Police Department Search Warrant in October 2011**

13.  In October 2011, officers from Westminster Police Department ("Westminster PD") served a search warrant at the Moran Street Premises in Westminster, California.  Based on my review of the Westminster PD search warrant affidavit and related reports, and my conversations with other law enforcement officials knowledgeable about the investigation, I learned the following pertinent facts about the events leading up to and the execution of the warrant:

a.  In January 2011, Apple contacted LE regarding the presence of counterfeit Apple cellular telephone parts available for sale online through a "Gadgetfix" eBay store owned and administered by LE.  Apple asked LE to remove some of the trademarked Apple items from the online store due to trademark infringement violations.  As late as August 2011, Apple investigators were still able to purchase counterfeit Apple cellular telephone parts from the Gadgetfix eBay store.

b.  In September 2011, detectives with the Westminster PD initiated a criminal investigation of LE and Gadgetfix based on information that LE was selling counterfeit Apple cellular telephone parts through the Gadgetfix online store on eBay.

c.  On or about September 21, 2011, a Westminster PD detective, acting undercover, emailed LE at

"chanle@gadgetfixwholesale.com" and asked if it would be possible to purchase cellular telephone parts directly from the business located at the Moran Street Premises.  The Westminster PD detective received an email from "chanle@gadgetfixwholesale.com" confirming that it would be possible to "stop by our store to pick them up."  The email also confirmed that the business address of the physical store from which the parts could be purchased was the Moran Street Premises.

    d.    On or about September 27, 2011, a Westminster PD detective, acting in an undercover capacity, entered the Moran Street Premises and spoke directly to LE.  The detective purchased three iPhone 4 back covers, one black, one pink, and one blue.  The trademarked "Apple" and "iPhone" logos appeared on all three of the back covers purchased from LE by the detective.  At the time of purchase, both trademarked logos were covered with a small strip of black tape on all three iPhone back covers.  According to Apple representatives, counterfeiters commonly cover logos and other registered marks in this manner to conceal trademarks in an attempt to evade detection and confiscation of counterfeit items by customs officials when the parts are imported into the United States.

    e.    The back covers were sent by law enforcement to Apple for examination and were determined to be counterfeit based in part upon the fact that genuine iPhone 4 back covers were only produced by Apple in two colors; black and silver.

7

Additionally, Apple does not authorize the production, distribution, or resale of trademarked parts or components of the iPhone for any reason to anyone outside of Apple, to include the aftermarket modification or repair of an iPhone.  According to Apple representatives, there are many aftermarket parts that can be used to fix an iPhone, but their trademarks are violated when the "Apple" and "iPhone" logos are fraudulently placed on non-genuine cellular telephone parts and the parts are sold as genuine Apple iPhone components.

      f.   On or about October 18, 2011, officers from Westminster PD served a search warrant at the Moran Street Premises for possible violations of California Penal Code Section 350 (Possession and Sales of Counterfeit Goods).  During the search warrant, law enforcement officers located and seized approximately 7,200 counterfeit Apple parts, miscellaneous documents, and other digital media as evidence.

      g.   During the search, LE was interviewed, and indicated the following:

         i.   He was the owner of Gadgetfix and EZ Elektronix.  He knew he was not an authorized reseller for Apple products.

         ii.   LE knew that the Apple iPhone parts that he sold from his store at the Moran Street Premises and online through eBay were in fact counterfeit, including that he was aware that Apple only made that model of iPhone in "black and

white." When asked why he continued to sell parts he knew were counterfeit, LE indicated that lots of people did that on eBay.

iii. When LE claimed that some parts might be "OEM"[1] parts, the investigators and the industry representative assisting with the search pointed out that there would be no reason to black out the logo or text reading "Apple" if they were genuine products, and further that those marks would not be spelled incorrectly if the parts were authorized. The investigators also reiterated that even parts that don't have a logo can still be counterfeit, if they are confusing.

iv. When questioned, LE admitted that he advertised the parts as OEM on eBay, and said, "I know it's still bad, but it's not like I'm selling a [whole] fake iPhone." The detective pointed out that customers still believed they were getting an Apple product when they saw the logo, and LE agreed that he advertised them as "OEM product," on his eBay stores.

**C.   HSI Investigation and Search Warrant in February 2012**

14.  In February 2012, HSI special agents and officers from Westminster PD served a federal search warrant at the Moran Street Premises in Westminster, California. Based on my review of the HSI search warrant affidavit, related reports, and my

---

[1] "OEM" refers to "Original Equipment Manufacturer," generally meaning, in this context, a company that produces parts and equipment that are used as components in the products of another company, which then sells them to end users. That is, LE has claimed that he buys genuine parts made, for example, for Apple for use it is iPhones, but gets them direct from the manufacturer, notwithstanding that Apple does not authorize such sales of its trademarked products.

conversations with other law enforcement officials, I learned the following:

     a.   On or about January 10, 2012, CBP officers at the DHL facility in Los Angeles inspected an inbound international shipment addressed to "EZ ELEKTRONIX" followed by LE's wife's name, at an address in Costa Mesa, California that, based on public real estate records, was LE's residence.

     b.   Examination of the shipment resulted in the discovery of 250 pieces of cellular telephone parts bearing the mark "Blackberry," 336 cellular telephone parts bearing the mark "HTC," and 200 pieces of cellular telephone parts bearing the mark "Motorola," all of which were certified by a CBP Import Specialist as being counterfeit. Other cellular telephone parts bearing marks relating to Garmin Fone (50 pieces), Samsung (60 pieces), Sony Ericsson (10 pieces), T-Mobile (250 pieces) and Verizon (205 pieces), were also discovered comingled in with the Blackberry, HTC, and Motorola parts. CBP inspectors observed that black tape obscured the trademarks and logos on each of the cell phone parts. Based on my training and experience and the totality of this investigation, I know that importers of counterfeit cell phone parts often obscure the trademarks on the parts, commingle various companies' parts in the same shipment, and import "small" quantities of each part in an effort to evade detection by customs officials and law enforcement and minimize loss in the event of discovery.

c.    On or about February 6, 2012, CBP transferred the seized shipment to HSI in Orange County in order to attempt a controlled delivery of the counterfeit parts to the intended recipient, LE's wife, at LE's residence in Costa Mesa, California.

d.    On or about February 14, 2012, HSI Orange County agents obtained an anticipatory search warrant signed by the Honorable Michael R. Wilner in Los Angeles, California.  The search warrant included authorization to equip the three boxes with electronic beacon devices that would alert agents when any of the boxes were physically opened.

e.    On or about February 15, 2012, HSI Orange County agents, with the assistance of the Westminster PD, conducted a controlled delivery of the boxes to the intended delivery address on the shipping labels.  During the operation, HSI agents observed a man, later identified as J.P., retrieve the boxes and load them into a black BMW sedan.  J.P. was followed by HSI agents as he drove in the BMW sedan with the boxes to the Moran Street Premises (i.e. the same location as the prior Westminster PD search and seizure of counterfeit items) where J.P. then loaded the boxes onto a cart and took them inside the Moran Street Premises.  Within the hour, the electronic beacon alerted the HSI agents that one of the boxes had been opened.  HSI agents and Westminster PD officers entered the business pursuant to the search warrant.

f.   The location was split into the EZ Elektronix warehouse on one side and the Viet Bao Daily Newspaper on the other.  J.P. and approximately nine other employees were discovered in the warehouse portion of the Moran Street Premises.  Following a brief field interview, all the occupants of the business were allowed to leave the premises.  J.P. volunteered to stay until LE, his uncle, arrived.  J.P. said that LE had asked him to transport the shipment from the residence in Costa Mesa to the Moran Street Premises using the black BMW sedan, and to take the shipment inside to be opened. J.P. added that the box was opened by J.V., an employee of EZ Elektronix.  Upon finding the beacon transmitter in the box, J.V. placed the transmitter on LE's desk.

g.   During a search of the rest of the business, HSI agents discovered approximately 11,700 additional cellular telephone parts from various manufacturers that were suspected to be counterfeit by representatives of a brand protection consulting company that was assisting with the search.  The items seized were valued at approximately $1,738,682 based on the prices for parts as they appeared at that time on LE's online eBay stores.  (A more accurate MSRP was unavailable as manufacturers of these parts do not sell them to the public.)

h.   During the search of the business, LE arrived and was provided with a copy of the search warrant.  LE was read and waived his Miranda rights and was interviewed by HSI agents.

During the interview, and together with a subsequent written statement, LE indicated the following:

       i.   The consignee of the shipment, T.T., was his wife, and LE had the shipments of cellular telephone parts shipped to her name at the residence in Costa Mesa at the recommendation of the Chinese cellular telephone parts manufacturers in China in order to evade scrutiny by Hong Kong customs officials but not by U.S. customs officials.

       ii.  LE knew he was not authorized by any cell phone manufacturer or company to sell their parts.

       iii. LE sold the parts on eBay either to cell phone repair stores or to end users.  He ordered parts primarily from China but also occasionally from Canada, Mexico and other distributors in the United States.

       iv.  LE believed that of the cell phone parts that he sold, including those that were being seized HSI, were genuine OEM parts or "compatible" (without logos), and not counterfeit, but added (again) that he knew he was not authorized to sell these parts.

       v.   LE told the HSI agents about the previous search warrant conducted by Westminster PD in October 2011 at that same location, during which all of the Apple parts in his inventory bearing the Apple logo were seized.

       vi.  LE said that he and his attorney had not at that time received any final decision from the Orange County District Attorney's Office as to whether any of the items that

13

were seized by Westminster PD in October 2011 were officially determined to be counterfeit.

vii. LE said that CBP had seized three of LE's shipments of cellular telephone parts and he had received a seizure notice for each seizure asking him to provide a letter of authorization to import or sell the items from the manufacturers or the owners of the trademarks. Since he could not provide the proper documentation, the shipments were destroyed by CBP.

i. In his written statement, LE also claimed that all of his parts were "100% OEM products, which [I] got from either overstock or refurbish[ed] phones." As noted above, this claim is not consistent with LE's other statements or the marks on the goods observed by investigators, or the unused quality of the parts at issue, which did not appear to be taken from broken devices.

j. LE added that most of the goods he received from China had the logos covered, which he claimed was explained to him as a way to clear Hong Kong and US customs more easily, so he would not get asked for an "authorized letter."

**D. Seizure of EZ Elektronix Shipments at DHL Facility in March 2012**

15. Based on my review of pertinent reports, and discussion with others involved, I know that on March 1, 2012, HSI Orange County agents were contacted by employees at the DHL facility in Irvine, California, regarding six separate shipments that were being detained in the DHL facility. The shipments

14

were addressed to EZ Elektronix at the Moran Street Premises. HSI Orange County agents inspected the shipments at the DHL facility and found them to contain suspected counterfeit cellular telephone parts. A physical inventory of the parts revealed approximately 3,795 counterfeit cellular telephone parts that had small strips of black tape covering the brand and/or logo on each part. A large portion of the parts were cellular telephone LCD faceplates. There were also a small number of cellular telephone back plates and LCD faceplates for tablet computers. The contents of all six shipments were seized as evidence, and based on CBP policy, a seizure notice would have been sent to the recipient address.

**E.  LE's Smuggling Scheme After February 2012**

16. After the second search warrant at the Moran Street Premises and the above seizures, it appears, as described in detail below, that LE changed his importation practices. Instead of importing counterfeit goods directly to his business or residence in Southern California, LE caused drop-shipment mailboxes to be opened in Oklahoma and Texas to receive these shipments under the names of two fictitious companies, "JV Trading Solutions" and later "JVU Unlock," and the names of two of his employees, J.V. and M.N. From there, the shipments would be reshipped to locations in Southern California under a new business name, "Pac Depot." These shipments entered the United States without being identified as counterfeit goods, and without identifying LE as the importer of record. Shipments not

15

containing counterfeit goods continued to be shipped directly to LE or his business in Southern California, saving on time and expense for these less-risky products. By these methods, LE ensured that the shipments containing counterfeit goods would be inspected at a different port of entry into the United States, and would not be associated with any of his tainted business names, or his own or his wife's name. As described below, this scheme was confirmed after the arrest and conviction of one of his co-conspirators, Hongwei "Nick" Du ("Du"), by HSI and the U.S. Attorney's Office for the Southern District of California in 2015. In particular, text messages exchanged between LE and Du made clear that LE told Du to ship only unbranded products directly to him, and to ship any trademark-infringing products to one of the drop-shipment mailboxes. Throughout this period, LE offered counterfeit goods for sale via his various eBay stores without identifying them as counterfeit items, and by providing misleading information suggesting that the parts were authentic or OEM.

    1.    Pac Depot and the Southern California Shipments

    17.    Based on my review of the business records, I know that in March 2012, about one month after the HSI search warrants, LE registered a new business name, "PAC-DEPOT, INC." ("Pac Depot") with the state of California, and identified a person I believe to be LE's mother-in-law, H.B., as the owner. LE did not, however, start a new eBay store under the name Pac Depot. Rather, based on my training and experience and

knowledge of this investigation, I believe that LE did not want to stop doing business under the names of the eBay stores for which he had built up a reputation and thousands of ratings on the site.  Therefore, Pac Depot was just a name to facilitate his smuggling scheme, and LE continued to do business under the same eBay store names as before.

18.  My review of business records also showed that LE opened a new warehouse location in Lake Forest, California, although he maintained the Moran Street Premises as the public address of his business.

19.  International shipping records indicate that LE then began to use the name Pac Depot (or variations thereof[2]) to receive shipments from China to various addresses near the new warehouse location in Lake Forest.  Based on the communications with Du, described in more detail below, I believe that these shipments were of goods that did not bear counterfeit trademarks.

    2.  Opus Virtual Drop-Shipment Mailboxes

20.  Based on documentation obtained from the business Opus Virtual, and documentation and witness statements from the drop-shipment mail services Mostly Mail and Office Solutions, HSI agents learned the following:

---

[2] I know, based on my training and experience, that it is common for persons engaged in unlawful importation of goods to use variations on the names of receiving businesses and persons in order to attempt to avoid being flagged by customs procedures, and I saw numerous examples of this practice throughout this investigation.  For example, names might be slightly misspelled, abbreviated, or hyphenated, or first and last names reversed, etc.

a.   In April of 2012 – that is, shortly after the HSI search warrant and customs seizures of LE's counterfeit shipments – Opus Virtual, a business that offers "virtual offices" to companies around the United States, was contacted from the email address jvtradingsolutions@gmail.com about setting up virtual mailboxes by someone using the name of J.V. (one of LE's employees, as described above).  As requested via email, Opus Virtual proceeded to open accounts in the name of "JV Trading Solutions" with two of its subcontracted locations, "Mostly Mail," in Weatherford, Oklahoma, and "Office Solutions," in Greenville, Texas.  (JV Trading Solutions appears to be a fictitious business name, as investigators have found no California business registration documents under this name.) J.V. was named as the accountholder of record, and the USPS forms for "Application for Delivery of Mail Through Agent" reflect the name and signature of J.V., with J.V.'s personal residential address in Stanton, California, for each of the accounts.  The Opus Virtual, Mostly Mail, and Office Solutions account-opening documents include a copy of J.V.'s California driver's license and his vehicle registration.

b.   Mostly Mail began receiving packages from China for JV Trading Solutions in May of 2012, which they would then reship to one of the addresses used by Pac Depot (the new business name registered in LE's mother-in-law's name) in Southern California.  They would email the jvtradingsolutions@gmail.com account with a list of shipments

18

that arrived each day, and inquire about what speed of reshipment service (express or overnight) was required for each shipment.  The user of the jvtradingsolutions@gmail.com email would respond with a list of the urgent packages, and would send their own shipping labels to be used for the reshipments.

      c.  Most of the emails from the jvtradingsolutions@gmail.com account were unsigned, but many were signed by one of LE's other employees, M.N., and at least one was signed "Chan" (i.e. LE).  Mostly Mail employees stated that they also spoke regularly by phone with M.N.

      d.  Mostly Mail would reship the packages to the Southern California addresses provided on the shipping labels, including in the names of Pac Depot and J.V. and M.N. personally.

      e.  In or around April 2014, Mostly Mail began receiving packages in the name of "JVU Unlock" in addition to JV Trading Solutions.  According to DHL records (described below), J.V. was most commonly the identified recipient for these packages as well, although M.N. was also often listed.

      f.  On or about February 7, 2015, four days after coconspirator Du was arrested (as described below), Mostly Mail received an email from the jvtradingsolutions@gmail.com account stating that JV Trading Solutions would no longer be receiving any shipments at Mostly Mail.  This was the last contact Mostly Mail received regarding this account, although Mostly Mail sent an email in April of 2015 saying that they were still receiving

payment from Opus Virtual for the account, and asking if the box should be kept open. They received no response. Mostly Mail also tried to get in touch about a shipment they had received for JV Trading Solutions after the February 7, 2014 terminating email, but after they received no response, the shipment was eventually turned back over to the parcel carrier.

  g.   Similar to Mostly Mail, the other mailing service contracted with Opus Virtual, "Office Solutions" in Greenville, Texas, began receiving packages for JV Trading Solutions in late April 2012, after the 2012 seizures of counterfeit goods from LE. As with Mostly Mail, Office Solutions employees would then forward the packages to Pac Depot at addresses in Southern California. At the same time that Mostly Mail began receiving shipments under the business name "JV Trading Solutions," Office Solutions also received a single shipment under that name, although this shipment appears to be an outlier, as it came after several months of inactivity with this mailbox, and there was no further activity after that.

  h.   At one point, the credit card to which Office Solutions billed the reshipping charges was changed to a card in LE's wife's (T.T.'s) name. The owner of Office Solutions said she believed she had dealt with both J.V. and LE's wife over time.

  i.   The owner said she believed that JV Trading Solutions may have stopped using Office Solutions because her

20

business would not guarantee same-day receipt and reshipping of packages.

j.   Opus Virtual was contacted by the jvtradingsolutions@gmail.com account in April of 2013 about obtaining a different service in Texas, because the customer service at Office Solutions was not satisfactory.  When personnel at Opus Virtual asked more about what was required, the jvtradingsolutions@gmail.com email account responded "We just preferred Texas.  All our shipping forward are packages." The user of the email then asked for a box to be set up in Kansas City, Kansas, although it appears that this arrangement was never finalized.

21.  According to international shipping records, between May 2012 and February 2015, Mostly Mail received approximately 1020 shipments from Hong Kong and China for JV Trading Solutions/JVU Unlock.  Office Solutions received approximately 88 shipments from Hong Kong/China for JV Trading Solutions between April 2012 and July 2013, with the one additional final package for JVU Unlock in April 2014.

**F.   Attempted Undercover Purchase in August 2013**

22.  On or about August 2, 2013, I interviewed a confidential source ("CS")[3] who told me that the CS had purchased counterfeit cell phone parts from EZ Elektronix on several occasions.  The CS, at my direction, placed a consensually

---

[3] The CS had been contacted by law enforcement for possible involvement in importing counterfeit electronics goods.  He was not charged.

monitored phone call to a person he knew who worked at EZ Elektronix to purchase counterfeit cellular telephone parts. During the phone call with an EZ Elektronix employee, the CS attempted to place an order for parts over the phone but was directed to complete the purchase on one of the company's online eBay stores, and the person on the call denied that they sold "logo" parts. (This claim is irreconcilable with the eBay listings that consistently described parts as "OEM" – if these parts were in fact OEM parts, they would have logos on them.)

23. Later on the evening of August 2, 2013, the CS placed an order, at my direction and in an undercover capacity, through the Gadgetfix eBay online store for several cellphone parts, which I had directed should include parts that were advertised with brand names or trademarks. The CS specifically requested that the parts be sent with the trademarked logos by including, "SEND WITH APPLE LOGO PLEASE!" and "SEND W/ LOGO PLEASE" on the "notes" section of the order form.

24. On or about August 5, 2013, the CS received the following email from the Gadgetfix eBay online store: "Thanks for your order with us. Unfortunately, we do not carry apple parts with logos hence a full refund will be sent back to your paypal. We appreciate your support and sorry for the inconvenience. Regards, Gadgetfix." Even though the CS ordered parts other than Apple, Gadgetfix did not fill the remainder of the order, and I believe they may have seen the entire order as suspicious and possibly connected to law enforcement.

**G.   Arrest and Conviction of LE's Supplier, Hongwei "Nick" Du**

25.   Based on my review of investigative reports, search warrants, court documents and other written records, as well as my communications with law enforcement agents involved in the operation, I know the information in the following paragraphs about the investigation, arrest, and conviction of one of LE's counterfeit parts suppliers, Hongwei "Nick" Du, by HSI agents:

a.   Beginning in 2013, Octavio Cesar Sana ("Sana"), a resident of San Diego County, along with Du and his China-based company "Saduan Industrial," were the subjects of an HSI San Diego criminal investigation for shipping counterfeit cell phone parts from China for sale in the United States.  HSI San Diego agents obtained a warrant pursuant to 18 U.S.C. § 2703 for the email account Du used to communicate with Sana.  During the search, agents recovered emails sent by Du to LE about the purchase and importation of cellphone parts into the United States.  Several invoices for the sale of counterfeit cell phone parts from Du to LE were also discovered in these emails.  On a series of 23 invoices dating between October 25, 2011 and August 21, 2012, T.T. (LE's wife) is listed as the contact, with their prior residential address as the destination address.  Chat messages and emails recovered from Du's phone showed that in January 2015 LE made arrangements for Du to travel to the United States from China for a meeting with LE.  Du listed LE as his point of contact in the United States on his visa application.

23

b.    During this visit to the United States in early February 2015, Du met with Sana and HSI San Diego undercover agents (UCAs) in San Diego County.  Du and Sana were led to believe that the UCAs were prospective customers interested in receiving a large volume of counterfeit cell phone parts from Du that would be shipped to the United States from China.  Du claimed he was part of a sophisticated scheme that was able to evade inspection and seizure of these shipments by U.S. Customs officials and that he was capable of supplying millions of dollars in counterfeit cell phone parts to the UCAs.  Du frequently referred to another importer in Orange County (later identified as LE) as his biggest customer in the United States.  Du showed the undercover agents proof of three wire transfers sent by LE to Du for the purchase of cell phone parts.

c.    On February 3, 2015, at the conclusion of a meeting with HSI San Diego UCAs, Du and Sana were arrested.

d.    Du pleaded guilty on May 11, 2016, in case No. 16-930-L in the Southern District of California to violating 18 U.S.C. § 371 (Conspiracy to Traffic in Counterfeit Goods and to Defraud the United States) and U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering).  Du admitted the following regarding his interactions with LE in the factual basis of his plea agreement and plea agreement supplement, which I have reviewed:

> As part of arranging [Du]'s trip to the United States
> on February 2, 2015 to attend a meeting with SANA and
> others in Imperial County (as described in
> subparagraph II. B.9 of the Plea Agreement), [Du]
> planned to meet with another customer Chan Hung Le
> ("Le") in Irvine, California. During [Du]'s meeting
> with SANA and others, [Du] informed them that [Du]'s

24

customer in Irvine, California (Le) was [Du]'s biggest customer, and that Le's business was responsible at that time for $1,000,000 in sales from [Du] each month.  [Du] communicated and coordinated with Le via text  messages on February 2 and 3, 2015.

From at least January 2012 to on or about February 10, 2015 there was an agreement between [Du], Le, and others to (i) import counterfeit cellphone parts and other electronics parts, such as tablet devices, provided by [Du] in China from Saduan Industrial to Le and his businesses in Irvine, California (among other locations in Orange County, California), such as EZ Elektronix, and (ii) defraud the United States by interfering with the lawful functions of the Department of Homeland Security, Customs and Border Protection by deceitful and dishonest means in the importation of those counterfeit parts.

[Du] joined that agreement, knowing of its purpose and intending to help accomplish it.

Beginning no later than January 5, 2012, [Du] sold at least $18,744,354 of cellular telephone and electronic components manufactured in China to Le in Orange County, California, for resale into the United States wholesale and retail markets through sales on Le's eBay sites, and through other means.  The great majority of the $18,744,354 paid to [Du] by Le constituted the cost of goods Le procured from [Du], while a small portion of it constituted direct salary for [Du] and others.

As [Du] knew, roughly half of the electronic components were counterfeit; that is, they bore registered trademarks (including logos and work marks) of electronics manufacturers such as, but not limited to, the Apple Inc. logo, or the registered marks of Samsung, HTC, Motorola, Nokia, LG, Microsoft, Asus, and Sony, which were spurious and not genuine.

[Du] and Le each knew that the marks were counterfeit; that is, that they were spurious and not genuine, were identical to or substantially indistinguishable from the actual registered marks, and were likely to cause confusion, mistake, or to deceive.

[Du] also agreed with Le to use specific methods to reduce the risk that counterfeit goods would be detected by United States and Chinese customs officials.  These methods included using a special shipping agent for shipments containing counterfeit goods; affixing covering stickers obscuring the

25

counterfeit trademarks from a quick inspection; and discussing the quality of counterfeit logos, marks and goods in the course of arranging specific shipments.

In order to conceal and disguise his criminal activity, Le also developed a separate shipping channel for items bearing counterfeit marks. At Le's instruction, counterfeit items were sent by [Du] to a commercial mail box in Oklahoma under a fictitious business name. As both Le and [Du] knew, Le had arranged to have these Oklahoma shipments re-packaged domestically and shipped to Le in Orange County. On some occasions, in order to avoid any delay caused by the repackaging process, Le and [Du] would arrange for [Du]'s commercial carrier to re-route counterfeit shipment from Oklahoma to Irvine once the shipment had cleared customs. [Du] and Le frequently communicated using the text message program WhatsApp (with Le using the account name 17146235099@s.whatsapp.net and [Du] using the account name 8613530574073@s.whatsappnet), and through other means, to discuss specific shipments from [Du] in China and the means by which those shipments could be sent to avoid detection and inspection by United States or Chinese customs officials.

As part of the conspiracy, [Du] knowingly sold Le more than $9.0 million of counterfeit goods in violation of law.

As part of the conspiracy, from January 5, 2012 to February 10, 2015 [Du] agreed with Le to transmit a series of over 150 international wire transfers totaling $18,744,364 from bank accounts controlled by Le in the United States to a bank account used by [Du] and Saduan in Hong Kong SAR to pay for the merchandise sold by [Du], and thereby promote the carrying on of their unlawful counterfeit goods venture. [Du] knowingly and voluntarily participated in that agreement, by, among other things, receiving funds wired to the Hong Kong bank account, and by regularly communicating with Le and those working with Le regarding the planning and receipt of such wire transfers.

## H.   Communications Between LE and Du on Du's Cell Phone

26.   Pursuant to a federal search warrant executed by HSI San Diego agents on Du's cell phone recovered during his arrest on February 3, 2015, computer forensic examination revealed

electronic instant message communication between LE and Du
dating back to 2012. I have reviewed pertinent communications
myself.

27. LE and Du talked in these messages about the shipping
practices described in Du's plea agreement, and reflected in the
information from Mostly Mail and Office Solutions described
above. That is, their communications reflected the practice of
sending counterfeit trademarked items (items with "logos") to
the mail box service companies in Oklahoma and/or Texas under
fictitious names for forwarding domestically to LE in Orange
County once they had cleared U.S. customs, while shipping non-
infringing ("no-logo") items directly to LE in Orange County.
They also regularly discussed "copies" of products, as compared
to "originals" or "OEM." The following are examples of some of
these communications:

a. On or about August 13, 2012, Du wrote to LE,
"Yesterday thuy [T.T. – LE's wife] talked with me about she
suggest two shipments let me have ur suggestion when you
available." LE responded, "U can ship full to oklahoma," and Du
clarified, "1717 e. Main st. Weatherford right??" (This address
is the location of the Mostly Mail drop shipment service
described above in Section E.)

b. On or about April 10, 2013, LE wrote to Du, "Stop
shipment with Sony lt26i ASAP...It has logo why r u sending to
California????????"

c.    On May 7, 2013, Du sent a picture of an iPhone 5 digitizer assembly, and said, "They are iPhone 5 assembly copy...The display is same as original new...I suggest we can let[] customers have a try."

d.    On or about May 13, 2013, Du wrote, "Only i5 assembly copy version need to ship by FedEx today right? Other merchandise will delivery by dhl today," and LE responded, "Ok" and then "Only no logo goods shipped directly," to which Du responded, "Then only 50x iPad mini digitizer blk...The rest [of the] items have to ship to ok [Oklahoma] address."

e.    On or about June 25, 2013, LE asked "why moto xt811 in CA package? Stop it. Call agent ASAP. If u don't stop package custom will seize it.  U can't save shipping fee by risk like this."

f.    On or about June 26, 2013, Du offered LE a Nokia digitizer for $27/unit, noting, "It's not OEM New. It's copy grade looks new.  US$42/unit for OEM new."  Later in this chat, Du and LE discussed that Du did two shipments that day, "CA and OK.  CA shipment is for urgent items." LE then wrote, "There is another way...When Oklahoma package with i5 clear[s] custom[s,] U can contact DHL and request change address to CA...That[] way I can get it faster."  LE then followed up about the quality of the Nokia digitizer copy, asking if Du had tested it.  Du responded, "Copy one function is good as original... It's slower when you test touch." LE asked, "What about look?" and Du responded, "Looks good...It's new," after which LE said "Ok send

28

me 50pcs to test." Du then reiterated, "Copy touch function is slower than original," to which LE responded, "A little is ok... They are a lot cheaper."

      i.  Based on my training and experience and knowledge of this investigation, I believe that in this exchange, Du was stating explicitly that the digitizer he was offering was not an authorized, or "OEM," component, but was a "copy," with a noticeably slower touch function, and that the OEM part would cost substantially more. In the same chat exchange, LE was explaining a variation on the scheme to try to get the Oklahoma-addressed packages more quickly, by having Du request their rerouting to California as soon as they cleared customs. Thus, he was making clear that the shipment to Oklahoma was specifically in order to evade U.S. customs inspections.

      g.  On or about October 22, 2013, LE told Du that all of the Samsung Galaxy S3 components that Du had shipped lately were improperly manufactured, with the "wrong lens" and "2 extra buttons at bottom." LE then sent two photos depicting what appears to be an actual S3 and one of the copies sent by Du side-by-side to show Du the differences. The Samsung brand logo is clearly visible on both devices. Du responded by saying this was how the supplier was making them, and explicitly saying "It's not OEM lens." LE replied that he "can not use" the components and would return them. LE then noted that on the white version of the component from this supplier, the lens was

better: "White they used ok lens." Du said he had called the supplier, who acknowledged that the supplier used a lower-cost lens on the blue version of the component. LE responded that this was "stupid" of the supplier, because "The blue lens is very cheap," and everyone would return the blue components. Du responded, "This is Chinese market..."

h.   On or about December 3, 2013, LE asked why Du's shipments to Oklahoma were so slow, and Du replied, "it's our fastest Chan, since it has logo." LE then told Du that another Chinese supplier did not have this issue, "Her dhl direct same to CA or OK," thus showing that LE had the same two-state arrangement with other suppliers.

i.   On or about December 9, 2013, LE told Du to contact DHL and reroute packages to California, saying "Only reroute packages that JUST CLEAR CUSTOM... Remember, only reroute when it just CLEAR CUSTOM...only when it CLEAR CUSTOM, I REPEAT...If u reroute it before it clear custom, u will lose the package... So make sure REROUTE AFTER CUSTOM CLEARANCE."

j.   On or about February 11, 2014, LE complained that Du's shipments didn't move fast enough, and Du suggested as one solution that LE "use more name, then they will accept" – meaning, then the weight limits that were inhibiting his ability to ship multiple packages at a time would not apply, since the packages would be going to different people. LE responded, "Use: [J.V. and M.N.]. Both names for OK address." (As noted above, these were the names of LE's employees used to receive

30

shipments at the Oklahoma drop-shipment location.)  When Du responded with skepticism that this would work, LE said that one of his other suppliers did this "with no problem" and that multiple shipments could go to the same address as long as they had "different receiver name."  Thus, in this chat, LE was again making explicit his similar arrangement with other suppliers, and that he was using his employees' names to evade import/export problems.

     k.   On or about April 2, 2014, LE told Du "I think Oklahoma is having problems.  Stop all shipments to OK immediately."  Du responded by saying that he would ship to Texas that day instead.  The next day, LE asked, "R u shipping to texas today?  Please change company name to JVU Unlock," and Du wrote he would call the shipper right away.  (This shipment appears to be the outlier received at the Texas location much later than other shipments, and with a new company name to disguise the recipient, as described above.)

     l.   On or about April 17, 2014, LE asked Du about a Motorola battery, and whether Du could get the "same as before," to which Du responded, "Copy right?"  LE confirmed that was what he wanted and said to "Send fast."

     m.   Finally, throughout the period of these chats, LE and Du would regularly reference wires being sent from LE to Du for payment for the purchased electronics parts.  These ranged in amount from approximately $50,000 to $440,000, and were most commonly in amounts of either $98,000 or $99,000.

31

**I.   HSI Search Warrants at EZ Elektronix in February 2015**

28.   Based on my participation in the following events, I
know that on February 9, 2015, shortly after Du's arrest, HSI
Orange County agents executed a federal search warrant for
counterfeit Apple cell phone parts at LE's EZ Elektronix
warehouse location in Lake Forest, California.  Agents seized
approximately 148 counterfeit Apple cell phone parts during the
search, as identified by brand protection experts sent by Apple,
and also observed thousands of "Samsung" branded cell phone
parts.  After Samsung representatives confirmed that parts
observed by agents were counterfeit, I requested and obtained a
roll-back search warrant for the same location to seize
counterfeit Samsung cell phone parts.  That warrant was executed
on February 12, 2015.  Agents seized approximately 5,100 Samsung
cell phone digitizers, 1,800 Samsung tablet digitizers, 250
Samsung batteries, 45 Samsung chargers, and 225 Samsung stylus
pens.  Approximately 6,000 of the 6,900 phone and tablet
digitizers (about 87%) and all of the batteries were determined
to be counterfeit based on physical and visual testing of each
individual part.  Testing performed by Samsung on the chargers
and stylus pens determined that those parts appeared to be
consistent with genuine parts.

29.   During this search, agents recovered a receipt of an
outgoing Wells Fargo wire transfer request made payable to
Saduan, which agents later confirmed was one of the same wire
transfers shown by Du to the UCAs as proof of the volume he was

capable of producing.  The transfer was authorized by T.T. according to the receipt, with her name, signature, and driver's license number all appearing on the receipt.

**J.   Review of LE's eBay Sales**

30.  An analysis of eBay records relating to sale of cell phone parts on eBay stores "EZ Elektronix," "usmobileparts," "gadgetfix," and "fix2save" revealed that between February 2012 and February 2015, LE appears to have sold tens of thousands of cell phone parts to thousands of customers through auction listings on these four stores.  As a representative sample of the large volume of sales records obtained from eBay, a more detailed analysis was conducted of the auction listing records for the "EZ Elektronix" store between August 2014 (six months prior to the HSI search warrants February 2015) and August 2015 (six months after the HSI search warrants February 2015). Review of these records showed the following:

a.   A total of 10,065 cell phone repair parts (to include LCD screens, digitizers, frames, etc.) were sold on LE's "EZ Elektronix" eBay store under listings that were created between August 10, 2014 and January 29, 2015.  No listings appear to have been created on this store between January 29, 2015 and February 9, 2015 (the date of the first HSI search warrant in 2015, shortly after Du's arrest on February 3, 2015).

i.   Of these items, 4,089 (approximately 40%) were sold under auction listings that specifically described the part being sold as "OEM" or "new OEM."

ii.   Another 142 items (approximately 1%) included the word "new" in the title of the listing without describing the parts as "OEM."

iii. The listing title for 641 of these items (approximately 6%) specifically described the parts as "replacement" without including "OEM" in the title of the listing.

iv.   None of the 10,065 items sold during this time period were listed as "OEM replacement" parts.  The words "generic" or "refurbished" did not appear in the titles for any of the listings.

v.   Virtually all of the remaining listings specifically identify a brand and model number associated with the part being listed but do not include "OEM," "new," or "replacement" in the title of the listing.

b.   A total of 5,229 cell phone repair parts (to include LCD screens, digitizers, frames, etc.) were sold on LE's "EZ Elektronix" eBay store under listings that were created between February 9, 2015 and August 6, 2015.

i.   Of these items, 429 (approximately 8%) were sold under auction listings that specifically described the part being sold as "OEM" or "new OEM."

ii.   Another 371 items (approximately 7%) included the word "new" in the title of the listing without describing the parts as "OEM."

iii. The listing title for 742 of these items (approximately 14%) specifically described the parts as "replacement" without including "OEM" in the title of the listing.

iv. Only one of the 5,229 items sold during this time period was listed as an "OEM replacement" parts. The words "generic" or "refurbished" did not appear in the titles for any of the listings.

v. Virtually all of the remaining listings specifically identified a brand and model number associated with the part being listed but did not include "OEM," "new," or "replacement" in the title of the listing.

### K. Review of LE's Bank Records and PayPal records and Identification of Other Suppliers

31. Review of banking records for accounts held or controlled by LE and review of PayPal records for eBay stores run by LE, including "gadgetfix," "gadgetfixwholesale," "fix2save," and "usmobileparts," for the period between February 2012 and February 2015 (the dates of search warrants by HSI at LE's premises) showed the following:

a. Five Wells Fargo business checking accounts controlled by LE received payments directly from PayPal for sales via LE's online eBay stores. PayPal records confirmed these payments were for the sale of cell phone and tablet parts. Several "PayPal transfers" were credited to LE's bank accounts each month from the sale of such parts.

b.    Between late April 2012 and early February 2015, LE sent a total of approximately $39,893,468.50 by wire transfer from three of these same Wells Fargo accounts to three large suppliers in China: Du's company (Saduan) and two other companies, identified as "A List Technology (HK) Co. Ltd." ("A List") and "Mobile Communication Parts (HK)" ("Mobile").

c.    From late April 2012 to early February 2015, LE wired to Saduan approximately $18,500,000.  The last wire transfer from LE to Saduan for $150,000 was sent on February 10, 2015, approximately one week after Du's arrest.

d.    Further investigation of the other two companies, A-List and Mobile, showed that customs records reflected that these two companies also shipped parts to LE in the same pattern as the shipments from Du.  That is, A-List and Mobile shipped parts both to "JV Trading Solutions," "JVU Unlock," or J.V. at the Mostly Mail box in Oklahoma and the Office Solutions box in Texas, as well as to Pac Depot (or variations on this name) at mailboxes in Orange County, California.  LE's communications with Du via chat, some of which are described above, corroborate that LE had the same arrangement with other Chinese suppliers as he had with Du.  Therefore, I believe that A-List and Mobile were shipping parts bearing counterfeit marks to the Oklahoma and Texas mailboxes in the same way as Du and his company, while shipping unmarked parts directly to LE in Southern California.

**L.    Information from Federal Express**

32.   On or about September 14, 2016, I received records from Federal Express regarding shipping records and account information relating to names, mailing addresses, phone numbers, and email addresses associated with LE's eBay and PayPal accounts.   These records included account and billing information, access logs, and international and domestic shipping records for accounts that were associated with LE and several of his business names.   The searches conducted by Federal Express for the information I requested appear to have been conducted on or about June 15, 2016.   The data detailed below was current as of that date.

a.   "EZ Elektronix," "Pac Depot," and "Gadgetfix Corporation" each had an account with FedEx, but "Chan Le" was listed as the contact person and linkoping@gmail.com was listed as the contact email for each profile, corroborating that they were all LE's business accounts.   Records obtained from Google, Inc. indicated that this email address was registered to "Chan Le."   This same email address is also listed on eBay and PayPal records for the EZ Elektronix eBay store.

b.   The phone number listed for these accounts was 714-623-5099.   This is the same phone number used to send and receive the messages with Du described above.

**M.    Information on International Shipments**

33.   The following is an analysis of shipping records data provided by DHL, Federal Express, and CBP for international and

domestic shipments associated with LE and several of his business names during LE's operation of the smuggling scheme in Oklahoma, Texas, and Irvine, between April 2012 and February 2015:

    a.    A total of 88 international shipments of cell phone parts were sent from Hong Kong/China to Office Solutions in Greenville, Texas under the name "JV Trading Solutions" or "JVU Unlock" between April 29, 2012 and April 8, 2014. The combined gross weight of these shipments was approximately 1,536.5 kilograms.

    b.    A total of 1020 international shipments of cell phone parts were sent from Hong Kong/China to Mostly Mail in Weatherford, Oklahoma under the name "JV Trading Solutions" or "JVU Unlock" between May 5, 2012 and February 4, 2015. The combined gross weight of these shipments was approximately 20,840.6 kilograms.

    c.    A total of 1027 international shipments of cell phone parts were sent from Hong Kong/China to mailing addresses and virtual offices in Southern California under the name "Pac Depot" and/or the name of H.B. (as described above, believed to be LE's mother-in-law). The combined gross weight of these 1027 shipments was approximately 21,372.9 kilograms. Notably, the "Pac Depot" addresses to which these "safe" shipments were sent were also used to receive the forwarded domestic shipments of parts that were initially shipped from Hong Kong/China to the mailboxes in Oklahoma and Texas.

34.   In total, the international shipping records indicate that LE received 2,127 shipments of cell phone parts from Hong Kong/China between April 2012 and February 2015.   Out of that total, 1,108, or approximately 52%, were sent through the mailboxes in Oklahoma and Texas.   I believe that this indicates that approximately 52% of the total number of the international shipments of cell phone parts received by LE during this time contained goods bearing counterfeit marks.   Calculating based on the shipments' weights reflects approximately the same proportion: the combined gross weight of all 2,127 shipments was approximately 43,750 kilograms, and the shipments sent through the mailboxes in Oklahoma and Texas weighed approximately 22,377.1 kilograms, resulting in approximately 51% representing counterfeit goods.

**N.   Resumption of Conspiracy with Du**

35.   In February 2019, I reviewed bank records for LE's wire transfer activity for the time period between the HSI search warrants in February 2015 up to August 2018.   Beginning in May 2018, LE began to transfer large sums of money to a company in Hong Kong called "Honape Industrial CO., Limited" ("Honape").   Internet searches for Honape indicated that Honape was registered as a business in Hong Kong on March 19, 2015 and was formerly registered as "Saduan Industrial CO., Limited" (i.e. Du's company, Saduan).   On or about February 28, 2019, I accessed publicly available business registration records on the

Hong Kong government "GovHK" website (https://www.gov.hk) and confirmed the following:

      a.  "HONAPE INDUSTRIAL CO., LIMITED" was incorporated in Hong Kong on November 18, 2009 under the name "SADUAN INDUSTRIAL CO., LIMITED."

      b.  The name of the company was changed to "HONAPE INDUSTRIAL CO., LIMITED" on March 19, 2015.

      c.  As of February 28, 2019, GovHK shows the "Name Status" for Honape as "current" and the "Company Active Status" as "live."

      d.  A Form NAR1 "Annual Return" dated November 18, 2015 shows "Hong Wei Du" (i.e., Du) as the "director" of Honape. No other executives or officers are listed on the document.

      e.  The same NAR1 dated November 18, 2015 shows "Hong Wei Du" as the sole shareholder of all 10,000 company shares.

      f.  A Form NAR1 "Annual Return" dated November 18, 2018 confirms that the information on the NAR1 filed in 2015 remains unchanged with the exception of a change of office address for Honape.  Both the new address and the previous address listed in 2015 are located in Kowloon, Hong Kong. According to the NAR1 filed November 18, 2018, "Hong Wei Du" remains the "director" of Honape, no other executives or officers are listed, and Du remains the sole shareholder of the company.

    36.  According to Department of Homeland Security border crossing records, Du was removed by law enforcement officials

from the United States on a flight to China on September 26, 2017, after the completion of his prison sentence.

37. Between May 29, 2018 and August 30, 2018, LE sent $2,591,000 over 20 wire transfers to Honape from the same Wells Fargo business checking account used between 2012 and 2015 to wire approximately $11 million to Du under the name "Saduan Industrial CO., Limited." The frequency and amounts of these wire transfers are consistent with LE's previous money laundering activity during the smuggling conspiracy with Du from 2012 to the time of Du's arrest in February 2015.

**O. Undercover Purchase of Counterfeit Items on eBay in November 2018**

38. On or about October 19, 2018, I confirmed that all four of LE's online stores on the eBay website ("gadgetfix," "gadgetfixwholesale," "fix2save," and "usmobileparts,") were still open. I observed that they contained several hundred active auctions for cell phone parts and accessories for major trademarked brands, including Apple and Samsung. The auctions listed both generic "replacement" parts and also "OEM" parts (sold as new and genuine) produced by or for the actual trademark owner such as Apple or Samsung. According to the photographs associated with many of the OEM listings for Samsung "LCD touch screen digitizers," the parts were packaged in what appeared to be factory-original product boxes that displayed registered Samsung trademarks on the packaging.

39. Between April 2013 and October 2018, I viewed auctions on these online stores several times. Based on my examination

41

of the auctions that appeared on October 19, 2018, it appears LE
is still selling the same type of cell phone parts that he has
been since my initial examination of these online eBay stores in
2013. The quantity of auctions do not appear to have decreased
over that time, indicating that the volume of LE's business has
not been substantially impacted by the HSI search warrant in
2012 or the two HSI search warrants in 2015.

40. In November 2018, I purchased cell phone parts in an
undercover capacity from each of LE's four eBay stores. The
U.S. Postal Service shipping label on all four parcels displayed
the return address for each order as "15041 Bake Pkwy, Ste C,
WWW GADGETFIX COM, Irvine, CA 92618-2540" (i.e. SUBJECT PREMISES
A). This address is the warehouse location for EZ Elektronix
and is publicly listed on the Google Maps website
(https://maps.google.com) as the business address for Pac Depot.

41. I purchased "LCD touch screen digitizers" for iPhone 7
cell phones from each of the four stores. One of these auctions
on the "gadgetfix" store claimed that the item for sale was an
"OEM" (i.e. "genuine") Apple part. Brand protection experts
from Apple subsequently physically examined the part and
determined that it was a "generic" replacement part that was not
a genuine Apple LCD touch screen digitizer for an iPhone 7
cellphone. This part does not, as designed by Apple, bear any
trademarks. The auction, however, fraudulently claimed that the
part was "OEM" when, according to Apple, it is not.

42.  I also purchased several "LCD touch screen digitizers" for Samsung Galaxy cellphones.  On November 7, 2018, I took detailed photographs of the Samsung parts and sent them to Samsung brand protection representatives for authenticity analysis.  Three of the auctions for these digitizers claimed that the items were "OEM" Samsung parts.  Two of these digitizers, purchased from the "gadgetfixwholesale" and "fix2save" eBay stores, bore "Samsung" trademarks on the screen of the devices and arrived in apparently genuine Samsung factory packaging that displayed "Samsung" trademarks on the boxes.

a.   The online auction on the eBay website for the digitizer purchased from "gadgetfixwholesale" specifically claimed the part to be a "genuine" Samsung part, describing the item as "OEM Genuine Touch screen with LCD Display Assembly" and "Brand New in Samsung Service Box."

b.   The online auction on the eBay website for the digitizer purchased from "fix2save" specifically claimed the part to be "OEM" in the title of the listing and described the item as "LCD Display and Touch Digitizer Screen Assembly" and "Brand New in Samsung Service Box."

c.   On or about November 7, 2018, Samsung brand protection representatives conducted a preliminary review of the product photographs and informed me that the "Samsung Service Boxes" in which the digitizers purchased from the "gadgetfixwholesale" and "fix2save" eBay stores were delivered were not genuine Samsung factory packaging based on their

43

finding that the "Samsung" trademarks on the boxes were counterfeit marks. The marks on the boxes were similar to the Samsung mark, but lacked certain specific styling used in the Samsung mark.

43. Based on this notification, I reviewed the images of the "Samsung Service Boxes" on the online eBay auction listings for the two digitizers purchased from the "gadgetfixwholesale" and "fix2save" stores that were delivered in this counterfeit packaging. The product images of the "Samsung Service Boxes" associated with both eBay auctions displayed the same counterfeit "Samsung" logo that appears on the counterfeit packaging delivered with the purchased parts.

44. On November 28, 2018, I was informed by brand protection representatives from Samsung that the LCD touch screen digitizer purchased from "gadgetfixwholesale" was a counterfeit device based on the analysis of physical characteristics of the part apparent in the product photographs that I submitted to Samsung.

45. According to Samsung, the other Samsung digitizers purchased from the "gadgetfix," "fix2save," and "usmobileparts" eBay stores appear to be consistent with genuine Samsung devices.

**P. Updated Analysis of Bank Records and International Wire Transfers**

46. Review of all banking records available to the investigation at this time for accounts held or controlled by LE

(which are held in his and his wife, T.T.'s, name) showed the following:

      a.   Between January 2012[4] and December 2018, LE sent a total of approximately $78,490,797 by international wire transfer to suppliers of cell phone parts in Hong Kong and China.

      b.   Of this total amount, $72,264,458 (approximately 92%) was sent to A-List, Mobile, and Saduan/Honape. These are the same three companies that have been shown through the course of the investigation to have participated with LE in a conspiracy to traffic counterfeit goods into the United States from Hong Kong and China (refer to Section K).

  47.  Review of all known international wire transfers sent by LE to A-List showed the following:

      a.   Between January 2012 and April 2018, LE sent a total of approximately $31,681,000 to A-List through international wire transfers. Of this amount, approximately $12,447,000 was sent to A-List after the February 2015 search warrants by HSI at LE's premises.

  48.  Review of all known international wire transfers sent by LE to Mobile showed the following:

      a.   Between January 2012 and December 2018, LE sent a total of approximately $16,359,094 to Mobile through international wire transfers. Of this amount, approximately

---

[4] International shipping records indicate that the business relationship between LE and the suppliers named herein predates the earliest banking records (January 2012) available to the investigation.

$13,071,000 was sent to Mobile after the February 2015 search warrants by HSI at LE's premises.

49. Review of all known international wire transfers sent by LE to Saduan/Honape showed the following:

a. Between January 2012 and February 2015, LE sent a total of approximately $21,727,364 to Saduan through international wire transfers. These transfers stopped shortly after Du was arrested.

b. In May 2018, LE resumed the transfer of money by international wire transfer to Du under the new company name "Honape Industrial CO., Limited" (refer to Section N of this affidavit).

c. Between May 2018 and December 2018, LE sent approximately $5,088,000 to Honape via international wire transfers.

50. In addition, based on an updated financial analysis of the bank accounts controlled by LE, four accounts continue to be used to receive payments from PayPal for the sale of cell phone parts. In approximately May to July of 2018, these same four accounts reflected recurring transfers several times a week of between $2,000 and $5,000 to a non-business account held jointly in the name of LE and his wife, T.T.; this account appears to be used to pay household expenses.

## Q.   Updated Analysis of Import Activity

51. As with prior significant law enforcement actions involving LE or his businesses, it appears that LE's shipping

and importation activity changed after the arrest of Du.  While the volume of wire transfers indicates that LE continues to import electronics parts in high volumes, importation records to addresses known to be used by LE at this point do not appear to be fully consistent with these money transfers, as described below.  In addition, surveillance at LE's current warehouse shows deliveries of packages via non-standard channels, as also described below.  Therefore, it appears likely that the importation records reflect only a partial picture of LE's current practices, and that he may be using names, addresses, or methods not yet identified to bring his products into the United States.

52.  The following is an analysis of shipping records provided by CBP for international shipments associated with LE and several of his business between February 2015 and March 2019:

a.  For a period of approximately two weeks after the HSI search warrant on February 12, 2015, LE did not receive any international shipments at any of the addresses known to be associated with LE or his businesses in California.  On or about February 28, 2015, imports of cellphone parts from A-List, Mobile, and other suppliers in China and Hong Kong resumed to known Gadgetfix and Pac Depot addresses in California.  Based on shipping records for imports consigned to Pac Depot and Gadgetfix, it appears LE moved to another warehouse located at 15041 Bake Parkway in Irvine, California (PREMISES A), as of

Friday, May 29, 2015. Shipments from A-List, Mobile, and other suppliers in China and Hong Kong continued without interruption at the new address the following Monday, June 1, 2015.

b. Between February 28, 2015 and March 5, 2019, a total of 2,739 international shipments of cell phone parts were sent from Hong Kong/China to either Gadgetfix or Pac Depot to LE or his business addresses in California. (Some of these shipments weighed two pounds or less, which I believe are likely returns.) Between June 1, 2015 and March 5, 2019, 2,607 shipments were received at PREMISES A, specifically.

c. 934 of these shipments were from A-List. Only 44 of these shipments appear to be directly tied to Mobile, based on shipper name, address, or phone number. Since February 2015, LE has transferred a comparable amount of money to A-List (approximately $12 million) and Mobile (approximately $11 million). This significant discrepancy in shipment volume between two suppliers who are receiving nearly the same compensation from LE indicates that Mobile is likely either sending shipments to LE at PREMISES A under a different name or they are sending shipments to LE at an address that is unknown to HSI at this time.

d. As noted above, between May 2018 and December 2018, LE sent approximately $5,088,000 to Honape via international wire transfers. International shipping records show no shipments to known addresses associated with LE and his businesses that were shipped under the name "Honape" or any

48

other business name known to be associated with Du during this timeframe. Thus, as with Mobile, I believe this indicates that Honape/Du is also either sending shipments to LE under a different name, or to an as-yet undiscovered address.

**R.   Surveillance at PREMISES A in January 2019**

53.   On January 8, 2019, I conducted a surveillance at PREMISES A. At approximately 12:30 p.m., a black Honda Accord sedan arrived at the premises and backed into the loading dock area of the warehouse. California DMV records identified the driver of the vehicle as an individual with the initials M.B. The Honda sedan did not bear any logos or markings that would indicate that the car was in some way used by a legitimate express consignment carrier such as UPS, Federal Express, or DHL. M.B. was not wearing any kind of uniform or hat that would identify him as an authorized delivery driver for a known express carrier.

a.   M.B. got out of the sedan and began to unload approximately ten large cardboard boxes that were covered in yellow tape. The boxes were similar in size and appearance to other shipments of counterfeit cellphone parts I and other HSI agents have observed being sent to LE from China and Hong Kong, for example in customs seizures described above. M.B. stacked the boxes on the edge of the loading dock and a Pac Depot employee came from inside the warehouse to load the boxes on a hand cart. The employee took the boxes back into the warehouse and parked the cart next to a workbench. He then took one of

the boxes off the cart, cut into it, and began to take out the contents.  M.B. went into the office area of the premises through the pedestrian door next to the loading dock.  M.B. came back out of the warehouse and moved so an official USPS truck could pull into the loading dock.  He then left the parking lot in the black Honda sedan at approximately 12:35 p.m.

b.   At approximately 12:36 p.m., a marked DHL delivery truck arrived and backed into the loading dock next to the USPS truck.  A uniformed DHL employee got out of the truck and unloaded approximately eight large cardboard boxes that were covered in yellow tape.  The boxes were similar in size and appearance to boxes known to be used by LE to receive shipments of counterfeit cellphone parts from China and Hong Kong.  They also matched the size and appearance of the boxes delivered by M.B. in the Honda sedan a few minutes earlier.

c.   At approximately 1:00 p.m., two Pac Depot employees began to open the boxes by the workbench received from the Honda sedan.  I observed that the interiors of the boxes were lined with a layer of solid Styrofoam.  I observed the warehouse employees remove bubble-wrapped bundles from the boxes that were also consistent with cellphone and tablet LCDs received by LE in the past.  This is consistent with the packaging used by LE to receive shipments of counterfeit cell phone parts from China and Hong Kong that were recovered from previous customs seizures and search warrants.

50

d.   At approximately 1:17 p.m., I observed a Pac
Depot employee unwrap the bubble-wrap bundles and observed that
the bundles contained stacks of tablet LCD screens.   These items
appeared to be consistent with the types of items LE has
purchased from counterfeit suppliers in the past.

54.   On January 11, 2019, I conducted another surveillance
at PREMISES A.

a.   At approximately 10:10 a.m., three Pac Depot
employees staged pallets, trash bags, and several of the large
yellow DHL shipping boxes outside the loading dock at what
appeared to be the beginning of their work day.   They loaded
these items onto dollies and hand carts and took them to a trash
compactor in the middle of the parking lot of the warehouse
complex (this area was publicly accessible, and appeared to be
shared by the entire complex, and not part of any individual
warehouse space).   The large yellow boxes were similar in size
and appearance to boxes used by LE to receive shipments of
counterfeit cellphone parts from China and Hong Kong, as
described above.   The employees did not put anything into the
small dumpster adjacent to the loading dock.   After placing all
the boxes and bags into the compactor the employees returned to
PREMISES A.

b.   At approximately 10:24 a.m., I entered the
concrete enclosure of the trash compactor.   No one entered the
compactor enclosure or used the compactor after the Pac Depot
employees took the boxes and other trash from PREMISES A to the

compactor. I observed several of the large, yellow-taped DHL shipping boxes in the compactor and entered the compactor to inspect the labels on the boxes. I recovered several shipping labels and invoices addressed to "PacDepot" and "Gadetfix Inc" from the compactor. The shipping labels appeared to have been removed from several of the yellow-taped DHL boxes in the compactor.

    i. Two of the invoices were from a company called "HK ATOUCH CO., LIMITED" ("HK ATouch") in Hong Kong. Each invoice was dated January 3, 2019, was for 800 "cell phone LCD replacement screens," and listed a declared value of "$1,200.00" for each shipment. The invoices were written to the attention of "CHAN LE" and listed a cellphone number (714-623-5099, i.e., the same phone number LE used between 2012 and 2015 to coordinate the smuggling scheme with Du).

    ii. According to customs records, between July 1, 2018 and March 2, 2019, HK ATouch sent approximately 129 shipments of cell phone parts to "Gadgetfix" at PREMISES A.

    c. At approximately 1:15 p.m., a white Toyota Sienna minivan ("Minivan 1") arrived at PREMISES A and backed into the loading dock. California DMV records identified the male driver as an individual with the initials Y.F. and the female passenger as an individual with the initials Y.X.X. Both Y.F. and Y.X.X. got out of the vehicle after it was parked at the loading dock. Two Pac Depot employees unloaded approximately 15 large yellow-taped boxes from the vehicle and put them on a hand cart at the

edge of the loading dock.  When all the boxes were unloaded from the minivan, Y.X.X. returned to the front passenger seat.  At approximately 1:30 p.m., Y.F. entered the vehicle and drove out of the lot.

55.  Surveillance of the loading dock at PREMISES A over the following two weeks showed the following:

a.   On January 15, 2019, Y.F. arrived at the loading dock at approximately 12:15 p.m. in Minivan 1.  A Pac Depot employee unloaded 19 yellow-taped boxes from Minivan 1 and took them on a cart into PREMISES A.  Y.F. then left a few minutes later.

b.   On January 17, 2019, a white minivan arrived at the loading dock at approximately 11:13 a.m. but the driver and license plate could not be identified due to impaired visibility from rain.  A Pac Depot employee unloaded approximately 16 yellow-taped boxes from the vehicle and took them on a cart into PREMISES A.  The white minivan departed at approximately 12:28 p.m.

c.   On January 18, 2019, M.B. arrived at the loading dock at approximately 12:48 p.m. in the black Honda Accord sedan seen previously.  A Pac Depot employee unloaded eight yellow-taped boxes from the Honda and took them on a cart into PREMISES A.  M.B. left a few minutes later.

d.   On January 21, 2019, Y.F. arrived at the loading dock at approximately 11:55 a.m. in Minivan 1.  A Pac Depot employee unloaded 15 yellow-taped boxes from the minivan and

took them on a cart into PREMISES A.  Y.F. departed at approximately 12:10 p.m.

     e.  On January 22, 2019, M.B. arrived at the loading dock at approximately 1:28 p.m. in the black Honda Accord sedan. A Pac Depot employee unloaded ten yellow-taped boxes from the vehicle and took them on a cart into PREMISES A.  M.B. departed a few minutes later.

     f.  On January 23, 2019, a second white Toyota Sienna minivan, with a different license plate from the previously seen minivan ("Minivan 2") arrived at the loading dock at approximately 2:13 p.m.  California DMV records identified the driver of the vehicle as an individual with the initials J.C.  A Pac Depot employee unloaded 13 yellow-taped boxes from Minivan 2 and took them on a cart into PREMISES A.  J.C. departed a few minutes later.

     g.  Finally, as recently as March 21, 2019, I have seen M.N., J.V. and T.T. all at PREMISES A.  Based on my surveillance on several occasions between January 2019 and April 2019, cars registered to and driven by each of these persons have been seen at PREMISES A during normal business hours. Therefore M.N. and J.V. continue to be employed there, and T.T. continues to be involved in running the business.

    S.  **Further Investigation of J.C. and LCTech**

     h.  According to DHL billing records, the shipping charges for the shipments to PREMISES A from HK ATouch in Hong Kong are being billed to a DHL account under the name "LCTECH

INTERNATIONAL INC" ("LCTech") located at 20539 E. Walnut Dr. N.,
in Walnut, California.  This address is publicly listed on the
Google Maps website (https://maps.google.com) as the business
address for LCTech.

      i.   J.C., the driver of Minivan 2, in which he
dropped off 13 boxes of cell phone parts on January 23, 2019, is
listed as the DHL account holder.

      j.   California DMV vehicle registration records link
J.C. and LCTech to another warehouse premises located at 20475
Yellow Brick Rd in Walnut, California.

      k.   International shipping records obtained from CBP
show that between November 3, 2018 and January 30, 2019, HK
Atouch has sent 178 shipments of cell phone parts to "MDA TECH
AND TRADE CO., LTD" ("MDA") at this warehouse address on Yellow
Brick Road.  Over the same approximate time period (November 8,
2018 to January 30, 2019), HK Atouch sent 58 shipments of cell
phone parts from Hong Kong to Gadgetfix at PREMISES A.

      l.   On February 19, 2019, I conducted an internet
search for "MDA TECH AND TRADE CO., LTD."  The first result
linked to a business listing for "MDA TECH AND TRADE CO., LTD"
on a Chinese website "TradeKey"
(https://cn.tradekey.com/company/MDA-TECH-AND-TRADE-CO-LTD-
7614313.html).  J.C. is shown as the contact on the business
listing above a description of MDA as a distributor of "Apple
parts & accessories, cellphone parts & accessories, game parts &

accessories, consumer electronics IC components, and car electronics products."

56.   On February 20, 2019, I conducted surveillance at the Yellow Brick Road warehouse premises.  At approximately 1:39 p.m., Minivan 2 arrived, driven by J.C.  California DMV vehicle registration records show that Minivan 2 is registered to "LCTech International INC, or [J.C.'s name, reversed]" at that Yellow Brick Road address.

57.   Based on my training and experience and knowledge of this investigation, I believe that this conduct is further evidence that, at a minimum, LE continues to use non-standard shipping channels and mechanisms to receive cell phone parts from China/Hong Kong.

   T.   **Conspiracy Remains Ongoing**

58.   Based on my training and experience, and the investigation as a whole, LE appears persistent over many years in continuing to commit violations of the Subject Offenses, notwithstanding his knowledge of law enforcement investigations into his conduct, including search warrants and seizures on his operations and the arrest of his co-schemer, Du.  In addition, given the large sums of money LE appears to have made as a result of his activity over many years (even in the face of law enforcement investigation), there is a significant likelihood that this activity continues, at least in some form, to the present.  The recent activity at his warehouse and related locations, as described above, coupled with the undercover

purchases and LE's recent wire transfer and importation activity, supports this likelihood.

## U.   PREMISES B and CHAN LE, and Digital Devices

59.   LE is believed to currently reside at 27562 Deputy Circle, Laguna Hills, California (PREMISES B).  As recently as March 28, 2019, HSI agents observed LE at this premises with T.T. and their children in the middle of the day.  Records obtained from T-Mobile in February 2019 show that LE remains the owner of the cellphone number he used to communicate with Du between 2012 and 2015.  Subscriber information for this number lists LE as the billing contact for the account and PREMISES B as the billing address on the account.  While T-Mobile only provided one day of records (November 29, 2018), these records indicate that several calls and text messages were sent throughout that day.  As of March 2019, California DMV registration records show several vehicles registered to T.T. or "Gadgetfix Corp or Chan LE" at PREMISES B.  As recently as March 28, 2019, HSI agents have observed these vehicles parked in the driveway of PREMISES B.  During several surveillances conducted by HSI agents at PREMISES A and B between January and March 2019, LE and T.T. have been observed driving these vehicles either to or from PREMISES A and B.  As of March 29, 2019, business license records on the California Secretary of State website (https://businesssearch.sos.ca.gov/) show LE as the incorporator and registered agent for "GADGETFIX CORPORATION." LE and T.T. are both listed as "officers" and "directors" of the

company according to the most recent Form SI-200 "Statement of Information" signed by LE and submitted to the California Secretary of State on November 11, 2018.  PREMISES B is listed as the address of record for LE and T.T. as officers of the company and PREMISES A is listed as the business premises.  The same information is listed on the SI-Form 200 for "EZ ELEKTRONIX CORPORATION" signed by LE and filed on April 20, 2018 and the Form SI-200 for "FIX2SAVE, INC" signed by LE and filed on August 24, 2018.

60.  As described above, LE has consistently used digital devices, in particular his personal phone, to conduct business relating to the conspiracy described herein.  He has retained the same telephone number throughout the duration of the conspiracy, and has used it to register shipping accounts and to communicate with co-conspirators, as described above.  I also know that applications such as WhatsApp, used by LE to communicate with Du, can be accessed across digital devices using the same account, such as by a phone and tablet, or a phone and computer.  Depending on user settings, these devices may retain all or some of the user's communications with other persons using the app.  Further, I believe that given the time difference to Hong Kong/China (15 hours ahead of California), LE likely needs to communicate with his suppliers outside of normal Southern California business hours, and that he therefore likely needs to do so from his residence.  Therefore, I believe that there will be evidence relating to the Subject Offenses on

digital devices used by LE.  I know, based on my training and experience and information obtained throughout this investigation, that LE is likely to have such digital devices either on his person or at his residence.  Depending on LE's location at the time of the search, I anticipate that his phone will be either on his person or nearby, while additional, particularly non-mobile, digital devices are likely to be at PREMISES A and B.  Therefore, I believe there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses will be found at PREMISES B and/or on LE's person, as well as at PREMISES A.

61.  As an officer and director for Gadgetfix, EZ Elektronix, and Fix2Save, personal electronic devices belonging to or used by T.T. are also likely to contain evidence of the violations alleged in this case and are also likely to be found at PREMISES A and B.  As described above, T.T. appears to be connected to the ongoing scheme in several ways, as reflected in the use of her name and credit card information for the Texas drop shipment account described in Section E, her name on the invoices and wire transfers described in Sections G and I, the text from Du described in Section H, the money transfers into her accounts described in Section P, and the surveillance of T.T. at PREMISES A described in Section R.  Therefore, I believe there is also probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses will be found on digital devices possessed by T.T.

62.  Finally, based on the above-described involvement by M.N. and J.V. in the drop shipment mailing scheme, and their apparent continued employment at PREMISES A, I believe there is also probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses will be found on digital devices possessed by M.N. and J.V.

## VII.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[5]

63.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

2.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

3.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) compel the use of LE's, T.T.'s, J.V.'s or

M.N.'s thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of the face of any of those persons with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VIII.   NON-LAW-ENFORCEMENT PERSONNEL TO ASSIST WITH SEARCH

64.   Pursuant to 18 U.S.C. § 3105, HSI intends to have representatives of Samsung and Apple present during the requested searches in order to assist law enforcement in the identification of counterfeit Samsung and Apple marks.

## IX. CONCLUSION

65.   For all the reasons described above, there is probable cause to believe that LE has committed the Subject Offenses, that is: there is probable cause to believe that (1) LE has conspired and continues to conspire with his suppliers in China and various individuals connected to his businesses to defraud the United States, including by disguising his importation practices; to traffic in counterfeit goods; and to import goods into the U.S. contrary to law; (2) LE has conspired and continues to conspire to transmit and transfer funds from the United States to Hong Kong/China with the intent to promote the carrying on of his trafficking in counterfeit goods; (3) LE has conspired and continues to conspire to commit wire fraud and mail fraud by fraudulently offering counterfeit and unauthorized electronics parts for sale on his eBay stores and using interstate and foreign wires and the mails to carry out his scheme; and (4) LE has used the means of identification of

numerous other persons during and in relation to this fraudulent activity.

66. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of the Subject Offenses will be found at the PREMISES A and PREMISES B and on CHAN LE's person, as described in Attachments A-1, A-2, and A-3.

/s/

BRENT ROGAN, Special Agent
Homeland Security
Investigations

Subscribed to and sworn before me
this 12 day of April, 2019.

KAREN E. SCOTT

HONORABLE KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

### PREMISES TO BE SEARCHED

The premises to be searched is described as 15041 Bake Parkway, Unit C, in Irvine, California ("PREMISES A"). The structure is a white commercial office building with no trim and tinted office windows located in the Phoenix Business Center. The building appears to consist of ten distinct businesses, divided into units "A" through "L." The building number "15041" is displayed in large gray numbers just below the roof-line at both ends of the building above units "A" and "L" and again in the middle of the building above unit "G."

PREMISES A, Unit C, has the unit letter "C" displayed in white above the front entrance on the south side of the building. There are two "FedEx" signs on the front of PREMISES A, one a window decal and the other a canvas tarp, that identify unit "C" as a "FedEx Authorized ShipCenter." PREMISES A appears to consist of two internal divisions: an "office" section on the east side of the unit accessible through a tinted glass door and a "warehouse" section on the west side of the unit that is accessible by two roll-up garage doors at a loading dock and an adjacent pedestrian door at the top of a small set of cement stairs. The pedestrian door displays a sign that reads "NOTICE: Employees Only."

## ATTACHMENT A-2

PREMISES TO BE SEARCHED

The premises to be searched is located at 27562 Deputy Circle, Laguna Hills, California ("PREMISES B").  The structure is white two-story single-family residence, with a brown shingled roof, light blue facia and window panes, and gray and white "stacked-slate" stone trim.  The attached 3-car garage is on the east side of the residence.  Each of the three identical garage doors is painted blue and contains twelve small tinted windows along the top.  A "U" shaped white concrete driveway curves in front of the garage.  The wooden, brown double front door is on the southwest side of the residence (facing south) and is accessible by a stone foot path from the street and a sidewalk from the driveway.  The house number "27562" is painted in black numbers on a white background on the curb on Deputy Circle to the right of the stone foot path that leads to the front door.  The house number is also displayed on a rust-colored decretive sign affixed to the exterior wall of the residence to the right of the front door.

## ATTACHMENT A-3

### PERSON TO BE SEARCHED

The person of CHAN HUNG LE ("LE"), an Asian male born on August 30, 1974, with black hair, approximately five feet seven inches tall, weighing approximately 130 pounds, with brown/black eyes. The search of LE shall include containers or conveyances that are within LE's immediate vicinity and control, including clothing and personal belongings, compartments, backpacks, wallets, briefcases, and bags at the location where the search warrant is executed. It shall not include a body cavity or strip search.



**ATTACHMENT B**

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (Conspiracy to Defraud the United States, to Traffic in Counterfeit Goods in violation of 18 U.S.C. § 2320, and to Import Merchandise Illegally in violation of 18 U.S.C. § 545); 18 U.S.C. § 1956(h) (Money Laundering Conspiracy); 18 U.S.C. § 1349 (Conspiracy to Commit Mail Fraud and Wire Fraud); and 18 U.S.C. § 1028A (Aggravated Identity Theft) (the "Subject Offenses"), namely:

a.   Cellular telephone and similar electronic device components bearing counterfeit trademarks, including but not limited to Samsung and Apple/iPhone products, as well as related packaging, containers, labels, labeling, and literature;

b.   Records, documents, programs, applications or materials relating to the importation, acquisition, possession, purchase, manufacture, sale, shipment, handling, use, or distribution of any products bearing counterfeit trademarks, including any such records relating to the importation or shipment of such goods to locations other than 15041 Bake Parkway, Unit C, Irvine, California;

c.   Records, documents, programs, applications or materials relating to the sale of misleadingly labeled or described electronics parts, such as parts advertised as OEM or otherwise suggested to be genuine consumer electronics brand-name parts;

i

d.    Records, documents, programs, applications or
materials relating to the use of names of persons other than
CHAN LE in connection with the importation, purchase, shipment,
or receipt of products or packages bearing counterfeit
trademarks;

e.    Records, documents, programs, applications or
materials relating to Hongwei Du, Saduan Industrial, Honape
Industrial Co., Limited, A List Technology (HK) Co. Ltd., or
Mobile Communication Parts (HK);

f.    Any documentation, keys, or access codes showing
ownership or control over storage or warehouse space or private
storage areas;

g.    Records, documents, programs, applications, and
materials showing ownership, dominion, or control over the
SUBJECT PREMISES;

h.    Any records, documents, programs, applications,
and materials consisting of or relating to communications with
any representatives consumer electronics manufacturers (such as
Apple, Samsung, and others);

i.    Assets, and evidence of assets, derived from or
used in connection with trafficking in counterfeit goods
(including in connection with the promotion of the carrying on
of that activity), such as United States and foreign currency
(that is, U.S. currency or U.S. currency equivalent in excess of
U.S. $500, including the first $500 if more than $500 is
recovered), negotiable instruments, financial instruments,

ii

books, receipts, bank statements and bank records, money drafts, money orders and cashiers' checks, receipts, check registers, and bank checks;

      j.  Records, documents, programs, applications, and materials relating to the processing, secreting, transfer, concealment or expenditure of any proceeds derived from or used in connection with trafficking in counterfeit goods;

      k.  Records, documents, programs, applications, and materials reflecting or relating to the identity or location others involved in the Subject Offenses, such as photographs, travel records, or communications;

      l.  Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

      m.  With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

          i.  evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

          ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security
software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

        vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

        viii.    records of or information about
Internet Protocol addresses used by the device;

        ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed

v

120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

   b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

      i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

      ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

   c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device

pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

      d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      g.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   During the execution of this search warrant, law enforcement personnel are authorized to: (1) depress the thumb- and/or fingers of CHAN HUNG LE, T.T., J.V., or M.N. (persons described in the Affidavit accompanying the warrant application) onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of any of those persons with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.   In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.